UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA

CASE NO. 1:19-CR-20754-SINGHAL

UNITED STATES OF AMERICA

v.

LUIS ANGEL TEJADA-GUZMAN,

        Defendant.
_____/

**THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO THE DEFENDANT'S MOTION TO SUPPRESS**

The Defendant, Luis Angel Tejada-Guzman, was a drug runner for a man named Jose Peguero. He regularly delivered cocaine to one of Peguero's dealers, Andres Ozual. On August 20, 2019, the Defendant delivered cocaine to Ozual's house. That cocaine had been ordered by a confidential source ("CS"). Law enforcement saw the Defendant make that delivery using his white Mercedes Benz, with Florida tag 81HEU. On September 9, 2019, the CS ordered an additional 9 ounces of cocaine from Peguero, to be picked up from Ozual. Early that day, the CS visited Ozual's house to pick up the cocaine, but Ozual only had 7 of the 9 ounces. Ozual told the CS that more cocaine would be delivered to Ozual later that day, and that the CS would be told when the cocaine was ready. That afternoon, the CS called Peguero, who told the CS that the additional two ounces would be ready with Ozual around 6:00 p.m. At 5:50 p.m., the Defendant – Peguero's cocaine delivery-man – was seen driving his white Mercedes Benz (Florida tag 81HEU) towards Ozual's house to deliver the additional cocaine. Law enforcement followed the Defendant, and saw him illegally cross the solid white lines while exiting the fly-way from the MacArthur causeway on to Alton Road, on Miami Beach. Law enforcement then stopped the

Defendant based on his traffic violation, as well as their reasonable suspicion that he was involved in criminal activity. After the stop, law enforcement asked if the Defendant had any weapons on him. He responded "no, no, no," and offered that the detectives could search his car. His consent was overheard and confirmed by each of the two detectives present. During the search of the white Mercedes, law enforcement found 281.3 grams of cocaine in the Defendant's trunk.

On February 26, 2020, the Defendant moved to suppress the drugs found in his car (DE 46). As explained in greater detail below, the Defendant's motion should be denied because: (1) law enforcement's decision to stop the white Mercedes was appropriate due to the Defendant's traffic violation and his ongoing criminal activity; (2) the Defendant consented to the search of his car; and (3) the search was appropriate under the "automobile exception."

I.     **FACTUAL BACKGROUND**

In August of 2019, the CS told law enforcement that Jose Peguero was selling kilogram quantities of cocaine in the Miami and Miami Beach areas. Law enforcement learned that Peguero had recruited Andres Ozual to distribute Peguero's cocaine out of Ozual's apartment. Ozual's apartment was located on Lenox Avenue, Miami Beach (the "Ozual Residence").

On August 20, 2019, law enforcement conducted a controlled purchase of cocaine from Peguero, by way of Ozual. First, law enforcement established surveillance at the Ozual residence, and at Peguero's residence. That surveillance would remain in place at the Ozual residence for the remainder of the day. At 11:32 a.m., the CS placed a controlled call to Peguero and asked about the purchase of three ounces of cocaine, which the CS had previously negotiated with Peguero on August 15, 2019. Peguero did not answer the phone call, but immediately responded via text. He told the CS that Ozual had two ounces of cocaine available, and that the third ounce would be available later that day at Ozual's residence.

At 12:55 p.m., under law enforcement surveillance, the CS entered the Ozual residence on foot. While inside the residence, the CS paid Ozual $2,150 in law enforcement funds for two ounces of cocaine. At 1:00 p.m., law enforcement observed the CS exit the Ozual residence, and then walk to the pre-determined law enforcement meeting location. The CS met with law enforcement, told them what had happened inside of the residence, and handed over the two ounces of cocaine. The cocaine subsequently tested positive for approximately 56.61 grams of cocaine.

Later that day, at approximately 4:11 p.m., the CS sent a text message to Ozual asking to buy the third ounce of cocaine. At 5:14 p.m., the CS texted Peguero asking when the other ounce would be ready for pickup. Peguero replied that Ozual would text the CS as soon as the new shipment of cocaine arrived.

At about 7:10 p.m., law enforcement saw a white Mercedes Benz bearing Florida tag 81HEU parked on Lenox Avenue directly in front of the Ozual residence. A white Hispanic male, later identified as the Defendant, exited the vehicle and walked into the Ozual residence. Shortly after, the Defendant left the residence, entered his white Mercedes, and drove away.

At approximately 7:15 p.m., Ozual texted the CS stating that the one ounce of cocaine had just arrived. At 7:39 p.m., the CS went to Ozual's residence with $1,080 in law enforcement buy money. While inside the residence, Ozual gave the CS one ounce of cocaine in exchange for $1,080. The CS then left the residence and met with law enforcement. The CS gave law enforcement a clear plastic bag containing the one ounce of cocaine and explained what had happened inside of Ozual's residence.

Importantly, between the time the CS left Ozual's residence after the first purchase (1:00 p.m.), and the time he arrived to pick up the last ounce of cocaine (7:39 p.m.), the Defendant was the only person to come to Ozual's residence. The residence was under surveillance the whole

time. Only the Defendant, in his white Mercedes, could have delivered the ounce of cocaine that the CS picked up at 7:39 p.m.

On August 28, 2019, the CS met with Peguero to negotiate the purchase price for nine more ounces of cocaine. On September 9, 2019, at around 11:30 a.m., the CS placed a controlled call to Ozual to discuss meeting to purchase the nine ounces of cocaine the CS had previously discussed with Peguero. Ozual explained to the CS that he only had seven ounces of cocaine at the time, but the additional two ounces would be available later in the day. The CS agreed to buy the seven ounces first, and then return later to buy the additional two ounces.

Around 12:12 p.m., under law enforcement surveillance, the CS entered the Ozual residence and handed Ozual $7,175 in buy money for seven ounces of cocaine. The CS then left the residence, met with law enforcement, told them what happened, and handed over a Walmart grocery bag containing a clear plastic bag with seven ounces of cocaine inside. The cocaine tested positive for approximately 196.58 grams of cocaine.

At about 12:25 p.m., law enforcement saw Ozual leave his apartment, and meet with Peguero. At 12:30 p.m., the CS – in law enforcement presence – called Peguero and requested a delivery time for the additional two ounces of cocaine. Peguero told the CS that the two ounces of cocaine would be ready after 6:00 p.m. In response, law enforcement established surveillance at the Ozual residence and at the MacArthur Causeway. At 5:50 p.m., law enforcement spotted the Defendant's white Mercedes Benz (Florida tag 81HEU) on the MacArthur Causeway headed towards Ozual's Residence. This was the same vehicle that had been used by the Defendant to deliver cocaine to Ozual on August 20, 2019. Law enforcement followed the white Mercedes as it exited the MacArthur causeway via the fly-way onto Alton Road – in the direction of Ozual's residence. As the Defendant exited the fly-way, he illegally crossed the solid white lines to his

right. The Defendant was pulled over shortly thereafter (about 5:55 p.m.) based on: (1) his traffic violation; and (2) his involvement in ongoing criminal activity.

After the Defendant's car came to a stop, law enforcement approached the vehicle. One detective approached the driver's side, and the other approached the passenger side. At the driver side, the Defendant was asked to produce his license and registration, which he did. The detective at the driver's side then asked if the Defendant had any weapons in the car. The Defendant responded, "no, no, no," and then offered that law enforcement could search his car. Both detectives heard the Defendant consent to the search of his car. After that, law enforcement asked the Defendant to step out of the car. He complied, was patted down, and then walked over to the sidewalk to speak with law enforcement. The Defendant was not handcuffed, and his interactions with law enforcement were subdued and friendly, not confrontational. While the Defendant was speaking with law enforcement, his car was searched. At no time did he contest that search, ask what was going on, or tell law enforcement to stop searching the car. Upon searching the Defendant's vehicle, inside the trunk, law enforcement located a toolbox that had a clear plastic bag sticking out of it. Inside the plastic bag, which was vacuum-sealed, there were approximately 281.3 grams of cocaine. Law enforcement then seized the cocaine as evidence, and released the Defendant to further their investigation. At around 6:38 p.m., the CS placed a controlled call to Ozual and asked about the two ounces of cocaine. Ozual stated that there was a problem with the delivery of the package, and he was unable to complete the drug transaction at that time.

## II.     **LEGAL STANDARD**

Defendant moved to suppress the evidence against him pursuant to Federal Rule of Criminal Procedure 12(b)(3)(c). "A motion to suppress must in every critical respect be sufficiently definite, specific, detailed, and nonconjectural to enable the court to conclude that a

substantial claim is presented." *United States v. Richardson*, 764 F.2d 1514, 1527 (11th Cir. 1985). "In short, the motion must allege facts which, if proven, would provide a basis for relief. A court need not act upon general or conclusory assertions founded on mere suspicion or conjecture." *Id*. While in certain well-defined situations the ultimate burden of persuasion may shift to the government upon an initial showing of certain facts by the defendant, it "is well established that the burdens of production and persuasion generally rest upon the movant in a suppression hearing." *United States v. Lincks*, 2009 WL 3256745, at *3 (S.D. Fla. Oct. 7, 2009) (Zloch) (quoting *United States v. de la Fuente*, 548 F.2d 528, 533 (5th Cir. 1977)). However, if a Defendant produces evidence that he was stopped or subject to a warrantless search, the burden shifts to the Government to justify the stop and search. *de la Fuente*, 548 F.2d at 533. The Government has met that burden here.

### III.   ARGUMENT

The Defendant's motion to dismiss should be denied because: (1) the stop of the white Mercedes was an appropriate *Terry* stop; (2) the Defendant voluntarily consented to the search of his white Mercedes Benz; and (3) that search was also lawful under the "automobile exception."

**a. The Stop of the White Mercedes was Appropriate because there was Probable Cause to Believe a Traffic Violation Occurred, and Reasonable Suspicion that the Defendant was Involved in Criminal Activity**

A traffic stop is "constitutional if it is either based upon probable cause to believe a traffic violation has occurred or justified by reasonable suspicion in accordance with *Terry*" that criminal activity is afoot. *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). When determining whether an officer had probable cause to believe that a traffic violation occurred, the "officer's motive in making the traffic stop does not invalidate what is otherwise objectively justifiable behavior under the Fourth Amendment." *United States v. Simmons*, 172 F.3d 775, 778 (11th Cir.

1999) (quotation omitted). The Constitution also permits police officers to conduct a brief investigatory stop if officers "have a reasonable suspicion that the suspect was involved in, or is about to be involved in, criminal activity." *Terry v. Ohio*, 392 U.S. 1, 19-20 (1968). "While reasonable suspicion is a less demanding standard than probable cause and requires a showing considerably less than preponderance of the evidence, the Fourth Amendment requires at least a minimal level of objective justification for making the stop." *Illinois v. Wardlow*, 528 U.S. 119, 123 (2000). Reasonable suspicion need not involve the observation of illegal conduct, but does require "more than just a hunch." *United States v. Lee*, 68 F.3d 1267, 1271 (11th Cir. 1995). A determination of reasonable suspicion is based on the totality of the circumstances. *United States v. Harris*, 526 F.3d 1334, 1337 (11th Cir. 2008). "In examining the totality of the circumstances, a reviewing court must give due weight to the officer's experience." *United States v. Briggman*, 931 F.2d 705, 709 (11th Cir. 1991). The stop of the Defendant's white Mercedes was justified both by his traffic violation and his involvement in criminal activity.

As to the traffic violation, in Florida it is illegal to ignore or dis-obey traffic control devices (including lane markings). *See* Fla. Stat. 316.074(1), 316.089(3). Here, on September 9, 2019, law enforcement first saw the white Mercedes as the Defendant was driving across the MacArthur causeway towards Miami Beach. They followed the Defendant as he took the fly-way exit from the causeway onto Alton Road. As the Defendant exited the fly-way, law enforcement saw him almost immediately change lanes to his right – crossing two solid white lines in the process. In doing so, the Defendant violated Fla. Stat. 316.074(1) and 316.089(3) by failing to comply with the lane markings. Based on their own observations, then, law enforcement had probable cause to believe the Defendant committed a traffic violation. Their decision to stop the Defendant was

entirely legal under *Terry* and it's progeny.

With regard to the Defendant's criminal activity, it is illegal to possess drugs, to possess drugs with the intent to distribute, to sell drugs, and to distribute drugs. *See*, *e.g.*, 21 U.S.C. §§ 841, 844, 856(a)(1); Fla. Stat. 893.13. Courts in the Eleventh Circuit have consistently found that the observation of suspected drug sales or deliveries was sufficient to provide reasonable suspicion of criminal activity. *United States v. Lopez-Garcia*, 565 F.3d 1306, 1313 (11th Cir. 2009). In *Lopez-Garcia*, law enforcement spotted the defendant in a car stopped in an area known for drug transactions. *Id*. They saw an unknown person leaning into the car window talking to the defendant. *Id*. Once law enforcement came into view, the unknown man walked away from the car, and the car drove away. *Id*. Shortly thereafter, law enforcement pulled the defendant over. *Id*. Prior to pulling the defendant over, law enforcement did not check with either the defendant or the unknown man to determine if drugs had changed hands. *Id*. Nonetheless, the Court found a reasonable suspicion that the defendant was engaged in hand-to-hand drug transactions. *Id*.; *see also United States v. Powell*, 222 F.3d 913, 917 (11th Cir. 2000) (reasonable suspicion of drug trafficking where the defendant entered and exited the home of a known drug dealer with a backpack).

Here, like in *Lopez-Garcia,* law enforcement saw the Defendant involved in sufficient criminal activity to allow a reasonable suspicion justifying his stop on September 9, 2019. First, on August 20, 2019, around 1:00 p.m., Ozual sold two ounces of cocaine to the CS, but could not fulfill the entire three-ounce order because his supply ran out. At 5:14 p.m., the CS texted Peguero asking when the other ounce would be ready for pickup. Peguero replied that Ozual would text the CS as soon as the new shipment of cocaine arrived. At about 7:10 p.m., the Defendant pulled up to Ozual's residence in his white Mercedes Benz (Florida tag 81HEU). Between 1:00 p.m. and

7:10 p.m., no one else came to Ozual's residence. The Defendant was the only one. He is the only person who could have delivered the last ounce of cocaine to Ozual. At approximately 7:15 p.m., Ozual texted the CS stating that the one ounce of cocaine had just arrived. At 7:30 p.m., the CS went to Ozual's residence and bought the final ounce of cocaine. Based on the above timeline, and the fact that no one else entered Ozual's residence during that time, it is inarguable that it was the Defendant who delivered the final ounce of cocaine. At the very least, it would be reasonable for a law enforcement officer – based on the totality of the circumstances – to suspect that it was the Defendant who delivered the cocaine.

Then, on September 9, 2019, the CS went to Ozual's residence and bought seven ounces of cocaine out of a nine ounce deal. At that meeting, Ozual explained that the other two ounces of cocaine would be available later that day. At 12:30 p.m., the CS called Peguero and requested a delivery time for the additional two ounces of cocaine. Peguero told the CS that the two ounces of cocaine would be ready after 6:00 p.m. At 5:50 p.m., law enforcement spotted the Defendant's white Mercedes Benz (Florida tag 81HEU) headed towards Ozual's residence. This was the same vehicle that had been used by the Defendant to deliver cocaine to Ozual on August 20, 2019. At that time, based on the totality of the circumstances, law enforcement had a reasonable suspicion that the Defendant was delivering the two ounces of cocaine requested by the CS. He had previously delivered cocaine to Ozual using the same car, in a very similar circumstance. This time, Peguero said the cocaine would be available from Ozual at 6:00 p.m., and the Defendant was seen driving to Ozual's residence at 5:50 p.m. That is sufficient for law enforcement to reasonably suspect that the Defendant was involved in criminal activity prior to his stop. The stop of the Defendant's car was therefore appropriate under *Terry* and the related Eleventh Circuit case law.

### b. The Defendant consented to the search of his vehicle.

After the lawful stop of the Defendant's white Mercedes, law enforcement legally searched the car based upon the Defendant's consent. An officer conducting a routine traffic stop may request consent to search the vehicle. *Schneckloth v. Bustamonte*, 412 U.S. 218, 222 (1973). A consensual search is constitutional if it is voluntary; if it is the product of an "essentially free and unconstrained choice." *Schneckloth*, 412 U.S. at 225. Voluntariness is "not susceptible to neat talismanic definitions; rather, the inquiry must be conducted on a case-by-case analysis" that is based on "the totality of the circumstances." *United States v. Blake*, 888 F.2d 795, 798 (11th Cir. 1989). For example, in *United States v. Espinosa-Orlando*, 704 F.2d 507, 513 (11th Cir. 1983), the Eleventh Circuit held that the Defendant's consent was voluntary even though the Defendant was pulled out of the car at gunpoint, was patted down for weapons, was forced to lie on the ground near the roadway, and eventually gave consent to search his car while the officer still had his gun drawn.

Here, after the Defendant's car came to a stop, law enforcement approached the vehicle. The Defendant was asked to produce his license and registration, which he did. The Defendant was asked if he had any weapons on him. He responded, "no, no, no," and then offered that law enforcement could search his car. Both detectives heard the Defendant consent to the search of his car. After that, law enforcement asked the Defendant to step out of the car. He complied, was patted down, and then walked over to the sidewalk to speak with law enforcement. The Defendant was not handcuffed, and his interactions with law enforcement were subdued and friendly, not confrontational. While the Defendant was speaking with law enforcement, his car was searched. At no time did he contest that search, ask what was going on, or tell law enforcement to stop searching the car. Based on the foregoing, the Defendant gave voluntary consent to search his car. That search was therefore appropriate under the Fourth Amendment, and suppression should be

denied.

### c. The Search of the Defendant's Vehicle was also Appropriate Under the Automobile Exception.

The search of the Defendant's white Mercedes was also legal under the Automobile exception. Thus, even if the Court were to find there was no consent, the search was still lawful. Under the automobile exception, a warrantless search of a car is constitutional if (1) the car is "readily mobile" (that is, operational), and (2) probable cause exists to believe that it contains contraband or evidence of a crime. *United States v. Lanzon*, 639 F.3d 1293, 1299-1300 (11th Cir. 2011). The "readily mobile" requirement is satisfied if the car "reasonably appear[s] to be capable of functioning." *United States v. Forker*, 928 F.2d 365, 369 (11th Cir. 1991). Probable cause, in turn, exists when under the totality of the circumstances, "there is a fair probability that contraband or evidence of a crime will be found" in the vehicle. *Id*. In determining probable cause, the Court may consider "the collective knowledge of law officers if they maintained at least a minimal level of communication during their investigation." Id. (internal marks omitted) (quoting *United States v. Willis*, 759 F.2d 1486, 1494 (11th Cir. 1985)).

Here, the automobile exception has been satisfied. First, the car was "operational," as law enforcement saw the Defendant driving it immediately before he was stopped,  Second, based on what law enforcement knew at the time of the stop, there was a "fair probability" that contraband or evidence of a crime would be found in the Defendant's white Mercedes. At that time, law enforcement knew that the Defendant had used his white Mercedes on August 20, 2019 to deliver cocaine to Ozual for the CS. Then, on September 9, 2019, Peguero told the CS that the remaining two ounces of cocaine would be ready around 6:00 p.m. At 5:50 p.m., law enforcement spotted the Defendant's white Mercedes Benz (Florida tag 81HEU) headed towards Ozual's residence. This was the same vehicle that had been used by the Defendant to deliver cocaine to Ozual the

11

first time. At that time, based on the totality of the circumstances, there was a "fair probability" that contraband or evidence of a crime would be found in the Defendant's white Mercedes. Thus, even if the Court does not find that the Defendant consented to the search of his car, that search was appropriate under the automobile exception.

To counter this finding, the Defendant wrongly argues that "law enforcement must have probable cause to search any containers within the vehicle" (DE 46 at 6-7). In support of that proposition, the Defendant cites – without a specific page reference – to *United States v. Ross*, 456 U.S. 798 (1982). The Defendant's use of *United States v. Ross* is incorrect. In fact, in *Ross*, the Supreme Court held almost the exact opposite of what the Defendant claims here. In *Ross*, law enforcement received a tip that the defendant was selling drugs out of his trunk. Based on that information and additional observations, law enforcement arrested the driver (the defendant). Law enforcement searched the car based on the automobile exception, and in the trunk they found a closed brown paper bag. Law enforcement opened that bag and discovered heroin inside. The Court of Appeals held that, even though there was probable cause to search the vehicle, law enforcement should not have opened the paper bag without a warrant. *Id*. at 802. The Supreme Court disagreed. First, the Supreme Court found that law enforcement had probable cause to search the entire vehicle under the automobile exception. *Id*. at 817. With regard to the search of the brown bag, the Court explained that a "lawful search of fixed premises generally extends to the entire area in which the object of the search may be found and is not limited by the possibility that separate acts of entry or opening may be required to complete the search. *Id*. at 820-21. The Court further explained that the "scope of a warrantless search of an automobile thus is not defined by the nature of the container in which the contraband is secreted." *Id*. at 824. Finally, the Court stated: "[i]f probable cause justifies the search of a lawfully stopped vehicle, it justifies the search

of every part of the vehicle and its contents that may conceal the object of the search." *Id*. at 825. Therefore, because law enforcement had probable cause to search the car, they were also allowed to search the brown paper bag without a warrant, and the Court of appeals was reversed. *Id*.

Similarly, here, law enforcement had probable cause to search the Defendant's vehicle. Under *Ross*, then, they were also allowed to search any containers within the vehicle, including the tool box in the trunk in which the drugs were ultimately located.

## V.     CONCLUSION

For the foregoing reasons, the undersigned respectfully requests that this Court deny Defendant's Motion to Suppress.

<br>

       Respectfully submitted,

       ARIANA FAJARDO ORSHAN
       UNITED STATES ATTORNEY

By:  s/ Carlee M. Valenti
       CARLEE M. VALENTI
       SPECIAL ASSISTANT UNITED STATES ATTORNEY
       Court No. A5502473
       U.S. Attorney's Office – INMLS - HIDTA
       11200 NW 20th Street, Suite 101
       Miami, Florida 33172
       Tel: (305) 715-7646 / 7653
       Fax: (305) 715-7639
       Email: Carlee.Valenti@usdoj.gov

## **CERTIFICATE OF SERVICE**

**I HEREBY CERTIFY** that on March 11, 2020, I electronically filed the foregoing document with the Clerk of the Court using CM/ECF.

By: s/ Carlee M. Valenti
CARLEE M. VALENTI
SPECIAL ASSISTANT UNITED STATES ATTORNEY